**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| SARAH DEPOIAN,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>MERLE BERGER,<br><br>　　　　　Defendant. | **CIVIL ACTION**<br><br>Case No.<br><br><br>**COMPLAINT AND JURY DEMAND** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Sarah Depoian hereby brings this Complaint and demand for a jury trial against Defendant Merle Berger. After Dr. Berger surreptitiously inserted his own sperm into his patient, Ms. Depoian, he covered up his egregious misconduct and prevented her from filing legal claims against him at the time. Plaintiff now seeks compensation for Dr. Berger's actions.

## INTRODUCTION

1.  Ms. Depoian and her husband saw Dr. Berger in 1980 for assistance conceiving a child. Because Ms. Depoian's husband's sperm could not be used, Dr. Berger promised to perform an insemination using the sperm of a medical resident who resembled her husband, who did not know her, and whom she did not know. With that understanding, Ms. Depoian consented to the insemination.

2.  Ms. Depoian recently found out that Dr. Berger did not use the sperm of a medical resident, as he had promised. Instead, he inserted his own sperm into her body. In doing so, Dr. Berger violated Ms. Depoian.

1

3.   Ms. Depoian, like all patients, had a right to know what was being inserted into her body. She also had a right to refuse the insertion of sperm into her body to which she did not consent.

4.   Dr. Berger's misconduct was not a mistake: Rather, in order to engage in the actions discussed in this lawsuit, Dr. Berger needed to masturbate in his medical office, walk over to his patient while carrying his own sperm, and then deliberately insert that sperm into his patient's body—all while knowing that she did not consent to his sperm entering her body.

5.   To make matters even worse, Dr. Berger then covered up his deeply disturbing conduct. He had multiple opportunities to be honest with Ms. Depoian after the insemination. He could have told her immediately after the insemination, just as he could have admitted his abuse of power days or weeks later. But in order to cover up his misconduct and prevent her from suing him promptly, he concealed his fraud from Ms. Depoian.

6.   Dr. Berger's life would have been entirely different had he admitted his assault on Ms. Depoian at the time. Dr. Berger went on to become one of the country's most prominent fertility doctors. He founded one of the nation's largest fertility clinics, Boston IVF, and was an Associate Clinical Professor at Harvard Medical School. He should have known better—and, in fact, did know better—than to abuse his patient, Sarah Depoian, as described in this Complaint.

## JURISDICTION AND VENUE

7.   Subject-matter jurisdiction in this matter is proper because the amount in controversy, exclusive of interest and costs, exceeds $75,000 and the parties are citizens of different states. 28 U.S.C. §1332(a).

8.   Venue is appropriate in the Eastern Division of the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to the claims occurred in this judicial district.

## PARTIES

9.    Plaintiff Sarah Depoian is a resident of Cumberland County, Maine.

10.   Defendant Merle Berger is a resident of Suffolk County, Massachusetts and Dukes County, Massachusetts. He has homes in Boston, Massachusetts and Martha's Vineyard, Massachusetts.

## FACTS

11. Ms. Depoian and her husband saw Dr. Berger for fertility services in 1980.

12. She had learned of Dr. Berger through a referral from Dr. Herbert Abrams.

13.   Ms. Depoian's husband's sperm could not be used for conceiving. Accordingly, Dr. Berger advised that he could perform an intrauterine insemination ("IUI") in order to achieve pregnancy for Ms. Depoian. IUI is a procedure that treats infertility by placing sperm directly into the uterus via a catheter.

14. Dr. Berger explained that he would insert the sperm of a medical resident who resembled her husband, who did not know her, and whom she did not know.

15. Ms. Depoian instructed Dr. Berger to use that sperm (*i.e.*, of the above-referenced medical resident) in order to become pregnant.

16.   Dr. Berger then performed the artificial insemination. Ms. Depoian's daughter was born in January 1981.

17. At all times relevant, Dr. Berger was in the commercial business of treating fertility conditions for compensation.

18. Ms. Depoian and her husband paid Dr. Berger a significant amount of money for the fertility treatment he provided to her.

19.   Now 42 years old, Ms. Depoian's daughter recently purchased (in late 2022) DNA kits from Ancestry.com and 23&me. She was excited to learn more about her family history.

20. The resulting family-history reports, delivered to Ms. Depoian's daughter in early 2023, did not yield a direct result for the biological father of Ms. Depoian's daughter. But her daughter was intrigued by the fact that it listed numerous people to whom she is related on her father's side of the family. Among those to whom she is related are Beckett Childs and Mindi Kleinman.

21. Ms. Depoian's daughter subsequently found out that Beckett Childs is Dr. Berger's granddaughter (the daughter of Dr. Berger's daughter, Alix) and Mindi Kleinman is Dr. Berger's second cousin. After speaking with one of her newfound relatives, Carolyn pieced together that Berger is her biological father.

22. In other words, against his clients' wishes, Dr. Berger used his position of trust and authority to insert his own sperm into Ms. Depoian.

23. Ms. Depoian's daughter then discussed the DNA results with her mom.

24. Ms. Depoian had not known the identity of the purportedly anonymous sperm donor before 2023. Dr. Berger had numerous opportunities to tell Ms. Depoian that he had inserted his own sperm into her body—immediately after doing so, as well as the following days, months, and years after he performed the IUI. But he purposefully did not do so, in order to cover up his misconduct.

25. Ms. Depoian would not have consented to the insemination if Dr. Berger would have told her that he was going to insert his own sperm into her body.

26. Ms. Depoian would have sued Dr. Berger immediately, had he admitted to her afterward that he had inserted his own sperm into her body.

27. Ms. Depoian felt incredibly violated upon finding out that her doctor inserted his own sperm into her body. She feels like she is the victim of assault. And she is concerned that, if Dr. Berger violated her in this manner, he may have done so to other unsuspecting female patients.

28. Shortly after learning of Dr. Berger's conduct, Ms. Depoian contacted Dr. Berger through counsel. In response, Dr. Berger did not deny that he inserted his own sperm into Ms. Depoian's body, contrary to her wishes and his promises. He also did not deny that he covered up his misconduct by not telling her about his actions after he performed the IUI.

## COUNT I

### *Fraudulent Concealment*

29. Plaintiff incorporates by reference all paragraphs of this Complaint as if set forth herein.

30. Dr. Berger made false misrepresentations of material fact.

31. In approximately April 1980, in his office in Massachusetts, Dr. Berger told Ms. Depoian that he had successfully performed the insemination that he and she had previously discussed.

32. In truth, however, Dr. Berger performed a very different insemination: he had inseminated her with his own sperm, not the sperm of an anonymous medical resident that he previously told her he would use. Dr. Berger knew this at the time, but persisted in claiming that he had performed the insemination with sperm that was not his own.

33. Dr. Berger purposefully concealed from Ms. Depoian that he had used his own sperm in her insemination. He took affirmative steps to prevent her from knowing that he had inserted his own sperm into her body. He told her immediately after the procedure, in his office, that the insemination went according to plan.

34. Furthermore, when speaking with Ms. Depoian numerous times thereafter, Dr. Berger purposefully withheld from Ms. Depoian that he had used his own sperm to impregnate her. This included, but was not limited to, multiple conversations between Dr. Berger and Ms. Depoian, in Dr. Berger's office, in early 1983.

35. Ms. Depoian returned to Dr. Berger in early 1983 for assistance with having another child. Ms. Depoian asked Dr. Berger if he could use the same donor for her second child that he had used for her first child. Dr. Berger explained that he could not do so because he did not know the identity of the donor that was used for her first pregnancy. This was a lie that Dr. Berger purposefully told in order to cover up his misconduct and prevent Ms. Depoian from taking legal action against him.

36.  Dr. Berger owed Ms. Depoian a fiduciary obligation to tell her the truth and not to act toward her in any fraudulent or deceitful way.

37. He owed Ms. Depoian a fiduciary duty and/or was in a similar relation of trust and confidence vis-à-vis Ms. Depoian that required disclosure of known material facts, such as the true source of the sperm he had inserted into her body.

38.  Dr. Berger acted with the purpose of inducing Ms. Depoian to act on his misrepresentation. More specifically, Dr. Berger knew that it was wrong for him to have inserted his own sperm into his patient—contrary to her instructions—but he did not want Ms. Depoian to sue him for his misconduct.

39.  Dr. Berger's post-insemination statements and/or concealment were designed to hide from Ms. Depoian his precise misconduct, so that Ms. Depoian would not have the knowledge she needed to sue Dr. Berger for his egregious violation of her body.

40.  Ms. Depoian relied on Dr. Berger's misrepresentations. She did not know at the time (or any time before 2023) that Dr. Berger had inseminated her with his own sperm, and thus did not sue Dr. Berger in 1980 (or any time until now) for any then-available legal claims, including but not limited to medical malpractice, battery, negligence, breach of fiduciary duty, and a violation of Massachusetts's consumer protection statute. To the extent that any of those claims would have

permitted double or treble damages at the time, Ms. Depoian will request those at trial, in addition to attorney fees and costs.

41. Learning of Dr. Berger's misrepresentations was and is greatly traumatic for Ms. Depoian. She has suffered—and continues to suffer—significant mental anguish, anxiety, stress from physical violations, and sleep disturbances including nightmares, among other injuries. She also has a newfound mistrust of the medical profession.

42. Ms. Depoian seeks damages for an amount she could have recovered had she not lost the opportunity to file a timely action.

## COUNT II

### *Intentional misrepresentation – fraud*

43. Plaintiff incorporates by reference all paragraphs of this Complaint as if set forth herein.

44. Dr. Berger made false misrepresentations of material fact.

45. In approximately April 1980, in his office in Massachusetts, Dr. Berger told Ms. Depoian that he had successfully performed the insemination that he and she had previously discussed.

46. In truth, however, Dr. Berger performed a very different insemination: he had inseminated her with his own sperm, not the sperm of an anonymous medical resident he previously told her that he would use. Dr. Berger knew this at the time, but persisted in claiming that he had performed the insemination with sperm that was not his own.

47. Furthermore, in early 1983, Dr. Berger falsely told Ms. Depoian that he could not use the same sperm donor for her second child that he had used to achieve a pregnancy that led to her first child. He intentionally lied, falsely claiming that he did not know the identity of the sperm donor that led to Ms. Depoian's first pregnancy.

48. Dr. Berger acted with the purpose of inducing Ms. Depoian to act on his misrepresentation. More specifically, Dr. Berger knew that it was wrong for him to have inserted his own sperm into his patient—contrary to her instructions—but he did not want Ms. Depoian to sue him for his misconduct.

49. Dr. Berger's post-insemination statements and/or concealment were designed to hide from Ms. Depoian his precise misconduct, so that Ms. Depoian would not have the knowledge she needed to sue Dr. Berger for his egregious violation of her body.

50. Ms. Depoian relied on Dr. Berger's misrepresentations. She did not know at the time (or any time before 2023) that Dr. Berger had inseminated her with his own sperm, and thus did not sue Dr. Berger in 1980 (or any time until now) for any then-available legal claims, including but not limited to medical malpractice, battery, negligence, breach of fiduciary duty, and a violation of Massachusetts's consumer protection statute. To the extent that any of those claims would have permitted double or treble damages at the time, Ms. Depoian will request those at trial, in addition to attorney fees and costs.

51. Learning of Dr. Berger's misrepresentations was and is greatly traumatic for Ms. Depoian. She has suffered—and continues to suffer—significant mental anguish, anxiety, stress from physical violations, and sleep disturbances including nightmares, among other injuries. She also has a newfound mistrust of the medical profession.

52. Ms. Depoian seeks damages for an amount she could have recovered had she not lost the opportunity to file a timely action.

## COUNT III

### *Violation of Massachusetts Consumer Protection Law, ch. 93A*

53. Plaintiff incorporates by reference all paragraphs of this Complaint as if set forth herein.

54. Plaintiff and Defendant are each "persons" as defined by M.G.L. c. 93A, § 1(a).

55. While acting in his trade, Dr. Berger was unfair and deceptive by making false misrepresentations of material fact. In approximately April 1980, in his office in Massachusetts, Dr. Berger told Ms. Depoian that he would perform the insemination that he and she had discussed, and then told Ms. Depoian that he had in fact successfully performed the insemination that he and she previously had discussed.

56. Again, in early 1983, Dr. Berger falsely told Ms. Depoian that he could not use the same sperm donor for her second child that he had used to achieve a pregnancy that led to her first child. He intentionally lied, falsely claiming that he did not know the identity of the sperm donor that led to Ms. Depoian's first pregnancy.

57. In truth, however, Dr. Berger knowingly performed a very different insemination: he had inseminated her with his own sperm, not the sperm of an anonymous medical resident he previously told her that he would use.

58. Dr. Berger knew the truth the entire time, but persisted in claiming that he had performed the insemination with sperm that was not his own.

59. Dr. Berger purposefully concealed from Ms. Depoian that he had used his own sperm in her insemination.

60. Dr. Berger took affirmative steps to prevent her from knowing that he had inserted his own sperm into her body. He told her immediately after the procedure, in his office, that the insemination went according to plan.

61. Furthermore, when speaking with Ms. Depoian numerous times after her pregnancy, Dr. Berger, while acting in his trade, purposefully withheld from Ms. Depoian that he had used his own sperm to impregnate her.

62. Dr. Berger's unfair and deceptive conduct was knowingly committed in furtherance of his own commercial, financial and reputational benefit at the expense of Ms. Depoian.

63. Ms. Depoian was greatly injured as a result of Dr. Berger's unfair and deceptive conduct.

64. Learning of Dr. Berger's deception was and is greatly traumatic for Ms. Depoian. She has suffered significant mental anguish, anxiety, stress from physical violations, sleep disturbances including nightmares, and difficulty in her marital relations. She suffers mistrust of the medical profession. There are days when she is so overwhelmed with anguish, stress and anxiety, that she is unable to function normally.

65. Ms. Depoian properly served Dr. Berger's counsel with a demand pursuant to M.G.L. c. 93A, § 9(3) on November 6, 2023. No reasonable offer of settlement was made.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE, Plaintiff respectfully prays for judgment against Defendant and requests the following relief:**

A.  An award to Plaintiff of damages in an amount sufficient to compensate her for her injuries;

B.  An award to Plaintiff of double or treble damages, as permitted by law;

C.  An award to Plaintiff of her attorneys' fees, costs, and interest, as permitted by law;

D.  Such further and other relief as may be just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all counts so triable.

Dated: December 13, 2023                        Respectfully submitted,

*/s/ Paula S. Bliss*
Paula S. Bliss, Esq., (BBO #652361)
Kimberly Dougherty, Esq., (BBO #658014)
Justice Law Collaborative, LLC
210 Washington Street
North Easton, MA 02356
Tel: 508-230-2700
paula@justicelc.com
kim@justicelc.com

And

Adam B. Wolf, Esq. (*pro hac vice* application
forthcoming)
Peiffer Wolf Carr Kane Conway & Wise, LLP
3435 Wilshire Blvd., Ste. 1400
Los Angeles, CA 90010
awolf@peifferwolf.com